## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **JUSTIN BARNES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  6:22-cv-01543-RDP** |
| | } | |
| **3M COMPANY INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant 3M Company, Inc.'s ("3M") Motion for Summary Judgment. (Doc. # 29). This Motion has been fully briefed (Docs. # 30, 35, 37), and is ripe for a decision. For the reasons discussed below, 3M's Motion for Summary Judgment (Doc. # 29) is due to be granted.

### I.      Facts and Procedural Posture

This is a case about alleged race and sex discrimination under Title VII and 42 U.S.C. § 1981. Plaintiff asserts that 3M discriminated against him when it terminated his employment for violating a workplace policy but did not terminate other employees who also violated the same policy.

The court has gleaned the facts set out in this opinion from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

3M "manufactures reflective sheeting, pavement marking tapes, and glass microspheres." (Doc. # 30 ¶ 1). Due to potential hazards involving 3M's machinery, 3M has an Electronic Device Policy ("the Policy") that prohibits employees from possessing personal electronic devices "in the production area during work hours." (Doc. # 31-7 at 9). Under the Policy, personal electronic devices can only be used during break times in specifically defined spaces, which are breakrooms, "approved office areas and conference rooms." (*Id*.) Otherwise, personal electronic devices must "remain in a secured location (locker, vehicle)." (*Id*.). 3M employees are told during their initial training that they may obtain a locker upon request. (Docs. # 31-1 at 21; 31-17). There is some evidence that employees may not be aware of the Policy's terms (Doc. # 31-1 at 25) and use personal electronic devices in prohibited areas. (*Id.* at 19, 25; Doc. # 31-16 at 16). However, according to the Policy's terms, violations of its provisions will lead to "disciplinary action up to and including termination." (Doc. # 31-7 at 9). After a violation occurs, 3M operations management conducts a Fact Finding investigation and reports to Human Resources. (Doc. # 31-5 at 10). As a 3M supervisor explained, "Fact-finding is like a sit-down interview. You asked questions to make sure they understood and why it happened . . . . At the conclusion of the interview, the fact-finding is turned in to management." (Doc. # 31-17 at 5-6). The 3M Management Review Committee, which the Rule 56 record indicates is primarily comprised of white men, reviews and approves employee discipline. (Doc. # 30 ¶ 25).

In 2021, 3M instituted a Diversity, Equity, and Inclusion program ("DEI program"). (Doc. # 31-6 at 17-20). In his 2021 end of the year summary to his supervisor, Human Resources employee Matt Collins referenced the year's hiring as "continu[ing] with diversity expectations," citing the percentage of new hires that were minority and female. (Doc. # 31-15 at 17). Collins also testified during his deposition in response to the question "Are most of the applicants that

seek positions at 3M white men?" that "[w]e have a lot of white males that do seek employment at 3M and the majority of the workforce is reflected in that." (Doc. # 31-5 at 46).

From 2017 to 2021, at least four 3M employees – Sandra Prowell ("Prowell"), Samantha Blackburn ("Blackburn"), Plaintiff Justin Barnes ("Barnes"), and Brody Meeks ("Meeks") – were disciplined for violating the Policy. While Prowell and Meeks were initially terminated for violating the Policy, their discipline was reduced to suspensions after union involvement. However, despite union involvement, Barnes's termination was upheld. And while Blackburn was suspended for violating the Policy, Barnes was terminated. Barnes brings this discrimination action alleging the Policy was applied differently to him because of his race and sex. (Doc. # 1). Because this Motion turns on 3M's treatment of Plaintiff and three comparators he has identified, the court reviews the Rule 56 evidence related to all four individuals.

### A.    Sandra Prowell

Prowell, a Black female, began working for 3M in 1994. (Docs. # 30 ¶ 31; 31-7 at 13). In 2017, Prowell was caught using her cell phone in a prohibited area. (Doc. # 31-7 at 14). When confronted, Prowell "took the phone to the guard's desk." (*Id.*). After the violation, 3M management interviewed Prowell, during which she stated the cell phone use "was a one-time deal due to issues with her son's school & his not feeling well." (*Id.*). Due to the duration of her employment with 3M, disciplinary action for Prowell had to be "reviewed up the chain" of 3M leadership (Doc. # 31-5 at 10); ultimately, 3M terminated Prowell's employment. (Doc. # 31-7 at 14). However, the union filed a grievance with 3M. After the filing of the grievance, Prowell's discipline was reduced to a three-week suspension, four-year Last Chance Agreement, and required participation in a campaign raising awareness of the Policy. (Doc. # 31-8 at 2). As of January 2024, Prowell was still employed by 3M. (Doc. # 31-5 at 11). Further, in his response to

the Motion for Summary Judgment, Barnes acknowledges that the comparative length of Prowell's employment with 3M renders her not similarly situated to Barnes. (Doc. # 35 at 29-30).

    **B.**    **Samantha Blackburn**

    Blackburn, a Black female, began working for 3M in 2020. (Docs. # 30 ¶ 33; 31-5 at 11). On June 29, 2021, Blackburn was operating machinery in the Maker 25 area, which is a prohibited area under the Policy. (Doc. # 31-8 at 13). The Operations Manager for that site, Daphne Hendrix, testified that she had seen Blackburn in the breakroom with a smart watch on and "asked her [and Plaintiff's] supervisor to make sure that she didn't have her Smart watch on." (Doc. # 36-1 at 6). Blackburn's supervisor, Donna Pollard ("Pollard"), then confronted Blackburn for wearing an Apple watch in the prohibited area. (Doc. # 31-8 at 13). Blackburn "immediately took her watch to her locker." (*Id.*). 3M operations staff interviewed Blackburn, who explained, "I was in a hurry when I came in today and I just forgot to take it off." (*Id.*). Pollard testified that at some point, she conducted a Fact Finding related to Blackburn's violation, and Blackburn had union representation during the Fact Finding interview. (Doc. # 31-17 at 7-8). Pollard also testified that she did not send Blackburn home after she violated the Policy. (*Id.* at 7).

    Blackburn was subsequently disciplined for violating the Policy with a one-day, unpaid suspension. (Doc. # 31-8 at 13). The union filed a grievance related to Blackburn's discipline. (Doc. # 31-8 at 20-21). 3M later acknowledged that the discipline Blackburn received was based on a mistake of fact. (*Id.* at 23). Specifically, in an email, Human Resources clarified:

> The company made a mistake issuing [Blackburn's] discipline. The oversight was the exact location where she was wearing the watch when the violation occurred. Based on a better understanding, [Blackburn] should have received harsher punishment, up to and including termination for this offense. Her discipline will not be changed and remain as issued.

(*Id.*). The union later placed the grievance on hold. (*Id.* at 21).

### C.    Plaintiff Justin Barnes

Plaintiff Barnes, a white man, began working for 3M in 2020. (Doc. # 30 ¶¶ 1, 7). In September 2021, Barnes worked in the Maker 23 area (Doc. # 31-1 at 29-30), which is a prohibited area for purposes of the Policy. (Doc. # 31-7 at 9). On September 16, 2021, Barnes used his cell phone in the Maker 23 area. (Doc. # 31-1 at 30). Barnes's supervisor, Pollard, confronted him about using his cell phone. (*Id.*). Barnes informed Pollard he did not have a locker in which to store his cell phone. (Doc. # 31-17 at 13). Barnes had not previously asked for a locker, and testified in his deposition that "on the initial hire-in date . . . somebody told me they would come and assign lockers, but that never did happen," and that he "never pushed the issue because I carried a lunch box and I wasn't one of the employees that had to shower and change clothes." (Doc. # 31-1 at 21). According to Pollard, on the day of Barnes's Policy violation, she offered to get Barnes a locker or store his cell phone in the supervisors' office, but he refused both. (Doc. # 31-17 at 13). According to Barnes, Pollard told him she would go get him a locker but did not tell him what to do with the cell phone in the meantime. (Doc. # 31-1 at 25, 31).

After Pollard confronted Barnes about using his cell phone, she walked away from him (*id.* at 31; Doc. # 31-17 at 14), and Barnes went into a supply room (the "tape room") attached to the Maker 23 area and placed his cell phone with his personal items. (Docs. # 31-1 at 31; 31-17 at 14). But, the tape room is also a prohibited area for purposes of the Policy. (Doc. # 31-7 at 9). Barnes testified that he had observed his previous supervisor "in there on his phone," but confirmed that no one had ever told him that the tape room was an approved area for his cell phone. (Doc. # 31-1 at 25). Pollard met Barnes in the tape room with Chad Johnson ("Johnson"), another 3M supervisor. (Docs. # 31-1 at 31; 31-17 at 14-15). Johnson asked Barnes where his phone was, and Barnes responded that his phone was in the tape room. (Docs. # 31-1 at 31; 31-17 at 14-15). Pollard

testified that she did not conduct a Fact Finding, and when pressed on why she responded, "[w]ell, when he refused, when he blatantly refused." (Doc. # 31-17 at 17). Pollard also testified that Barnes did not have union representation when this happened. (*Id.*). Johnson subsequently escorted Barnes out of the facility. (Docs. # 31-1 at 31-32; 31-17 at 16).

Pollard wrote a statement describing the incident with Barnes. (Doc. # 31-17 at 55). The written statement indicated that Barnes put his cell phone in his pocket and did not remove it from his pocket. (Doc. # 31-17 at 55). After reviewing Pollard's statement, past disciplinary actions taken against Prowell and Blackburn, and seeking legal advice (Doc. # 31-9 at 46-49), the 3M Management Review Committee terminated Barnes's employment. (Docs. # 31-5 at 24-25; 31-9 at 31-32). The union subsequently filed a grievance seeking an alteration to Barnes's discipline. (Docs. # 31-10 at 5-8; 31-5 at 31, 33). On September 24, 2021, Barnes and his union representative met with 3M Human Resources to discuss the grievance, but 3M did not alter Barnes's discipline. (Docs. # 31-5 at 32; 31-10 at 5-6). The union did not further arbitrate the matter. (Doc. # 31-5 at 34). Barnes was terminated for violating the Policy and his termination was confirmed. (Doc. # 31-4 at 28).

### D.    Brody Meeks

Meeks, a white man, began working for 3M in 2019. (Docs. # 30 ¶ 36; 31-5 at 35). In November 2021, Meeks was working as an operator in the Maker 23 area. (Doc. # 31-10 at 14). On November 3, 2021, Meeks was confronted by his supervisor for having his personal cell phone in the Maker 23 area, a prohibited area for purposes of the Policy. (Doc. # 31-10 at 14). Meeks subsequently left the Maker 23 area with his supervisor and took his cell phone to the supervisor's office. (Doc. # 31-11 at 2). Meeks's supervisor interviewed him, and Meeks explained, "I took [the cell phone] to the bathroom with me and forgot it was in my back pocket." (*Id.*).

After reviewing the Fact Finding into Meeks's violation and past disciplinary actions taken against Prowell, Blackburn, and Barnes, the 3M Management Review Committee terminated Meeks's employment. (*Id.* at 3; Doc. # 31-10 at 29). The union filed a grievance, requesting that Meeks's discipline be altered. (Doc. # 31-5 at 38). 3M subsequently changed Meeks's discipline to a three-week suspension and a four-year Last Chance Agreement. (*Id.*; Doc. # 31-11 at 7). As of January 2024, Meeks was still employed by 3M. (Doc. # 31-5 at 38-39).

On December 9, 2022, Barnes filed this lawsuit against 3M alleging three claims: sex discrimination under Title VII (Count One), race discrimination under Title VII (Count Two), and race discrimination under 42 U.S.C. § 1981 (Count Three).

## II.    Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). The court does not weigh the evidence as fact-finder; rather, it must "determin[e] whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

## III.    Analysis

"[E]mployers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015). However, under Title VII and § 1981, an employer cannot fire an

employee based on a protected classification. Title VII prohibits discrimination based on "race, color, religion, sex or national origin," 42 U.S.C. § 2000e-2(a)(1), and § 1981 prohibits "intentional race discrimination." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (describing 42 U.S.C. § 1981).

Barnes's Complaint brings discrimination claims under both § 1981 and Title VII. (Doc. # 1). Section 1981 discrimination can only be established under a single-motive theory – showing racial discrimination was the *only* but-for cause of the adverse employment action. *See Phillips*, 87 F.4th at 1321. In contrast, Title VII discrimination can be established under a mixed-motive theory – showing racial discrimination was one of many "motivating factors" in the adverse employment action. 42 U.S.C. § 2000e-2(m). The Eleventh Circuit has described the former as a higher standard for causation. *Tynes*, 88 F.4th at 943. Like Barnes, the plaintiff in *Flowers* brought claims under both § 1981 and Title VII. 803 F.3d at 1333. In that case, the Eleventh Circuit found the plaintiff's § 1981 claim "r[ose] and f[ell] with his Title VII" claim. *Id.* at 1335 n.7. Similarly, here, Barnes's § 1981 claim falls along with his Title VII claim.

"Discrimination claims brought under Title VII may be pursued under a 'single motive' theory – in which the employee alleges that unlawful bias was the 'true reason' for an adverse employment action." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). Or a plaintiff may employ "a mixed-motive theory – in which she alleges that bias was simply '*a* motivating factor for the adverse action, 'even though other factors also motivated the practice.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)) (emphasis added). In other words, "[t]he single-motive theory is based on the idea that discrimination was the *only* reason for the termination, whereas the mixed-motive theory allows for liability to attach where discrimination was a motivating factor in the termination but the termination could have happened because of other, permissible reasons."

*Cromartie v. Cent. Ala. Food Servs.*, 2023 WL 5197872, at *3 (M.D. Ala. Aug. 11, 2023) (emphasis in original).

Single-motive and mixed-motive discrimination claims can be established with either direct or circumstantial evidence. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)). "Direct evidence of discrimination is 'evidence which, if believed, would prove the existence of fact in issue without inference or presumption,'" while "[c]ircumstantial evidence is evidence that suggests but does not prove a discriminatory motive." *Cromartie*, 2023 WL 5197872, at *5. Barnes asserts both single-motive and mixed-motive claims of race and sex discrimination, and supports the claims with circumstantial evidence.

After careful review, the court concludes that Barnes's claims for race and sex discrimination cannot survive summary judgment. First, he has not established a prima facie claim of race or sex discrimination under *McDonnell Douglas*. Second, Barnes has not rebutted as pretextual 3M's legitimate, non-discriminatory reason for his termination. Third, Barnes has not shown why he should succeed on his single-motive theory under the convincing mosaic framework. Fourth, Barnes has not sufficiently briefed a claim of race or sex discrimination under a mixed-motive theory and, in any event, he has not pointed to a material issue of fact as to that theory. Because Barnes has failed to carry his burden under Rule 56 of showing that there are genuine issues of material fact as to his race and sex discrimination claims, he cannot withstand 3M's Motion for Summary Judgment.

### A.    Barnes Has Not Established a Prima Facie Claim.

Historically, when an employee bases his single-motive discrimination claim on circumstantial evidence, a court applies the *McDonnell Douglas* burden-shifting framework.

*Phillips*, 87 F.4th at 1321 (citing *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008)). Under this framework, the employee first must show a prima facie case of discrimination. *Quigg*, 814 F.3d at 1237 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Then, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once the employer has done so, the employee may attempt to demonstrate that the employer's proffered reason was, in fact, merely pretext for the employer's acts. *Id.* The Eleventh Circuit has explained that under the *McDonnell Douglas* framework:

> the employee must first establish a prima facie case of discrimination by showing that (1) [he] belonged to a protected class, (2) [he] was subjected to an adverse employment action, (3) [he] was qualified to perform the job in question, and (4) [his] employer treated similarly situated employees outside [his] class more favorably. If the employee establishes a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its actions. If the employer articulates such a reason, the employee must then show that the employer's stated reason was merely a pretext for unlawful discrimination.

*Phillips*, 87 F.4th at 1321 (internal quotation marks omitted).

It is undisputed that Barnes has established the first element (that he belongs to a protected class – here, race and sex) and the second element (that he was subjected to an adverse employment action – termination). (*See* Doc. # 30 at 19). 3M does not concede (nor does it even discuss) whether Barnes satisfies the third element (that he was qualified). (*Id.*). But, regardless of whether Barnes satisfies that element, he has failed to establish the fourth element – that 3M treated similarly situated employees (*i.e.*, comparators) outside of his class more favorably.

A comparator employee is one who is from outside the plaintiff's protected class but is otherwise "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc) (*Lewis I*). The Eleventh Circuit has outlined that, "[o]rdinarily, for instance, a similarly situated comparator – " (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment

policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff . . . and" (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

Barnes's complaint identified two comparators: Prowell and Blackburn.[1] (Doc. # 1 ¶¶ 53-57, 63-67). But Barnes's Response (Doc. # 35) conceded that "Prowell is not a valid comparator." (*Id.* at 29). For the reasons discussed below, Blackburn is also not a valid comparator. Therefore, Barnes has failed to establish the fourth element of a prima facie case of race or sex discrimination.

Blackburn does not satisfy the first guidepost for comparators outlined in *Lewis* because she did not engage in the same basic conduct or misconduct as Barnes. The Eleventh Circuit has indicated that even where employees violate the same policy, different circumstances surrounding the violation can invalidate a comparator. *Jenkins v. Nell*, 26 F.4th 1243, 1248, 1250 (11th Cir. 2022). In *Jenkins*, the plaintiff (who was fired) told his supervisor in a serious tone to get out of his face and never apologized for the comment, *id.* at 1247, while another employee (who was not fired) used a joking tone to threaten his supervisor and later apologized. *Id.* at 1250. Even given that slight nuance, our circuit court determined that the second employee was not a valid comparator "because the circumstances surrounding his misconduct were not the same or substantially similar as [the plaintiff]." *Id.* The Eleventh Circuit has also explained that there could be "some good reason" to distinguish between conduct that otherwise appears to be the "same" as a plaintiff's misconduct. *Lewis I*, 918 F.3d at 1227 n.13 (describing that "a regularly scheduled a.m. staff meeting" could be a valid reason "for concluding that morning absences are more detrimental to workplace efficiency or morale than those in the afternoon").

---

[1] Barnes did not proffer Meeks as a comparator for the purposes of the prima facie case, but Barnes does argue that 3M's treatment of Meeks shows pretext. The court separately addresses his pretext argument below.

Applying principles from those cases here, although Blackburn violated the same Policy that Barnes did, the circumstances surrounding Blackburn's violation are sufficiently different to distinguish Blackburn as a valid comparator. While Blackburn was merely *wearing* her Apple watch in a prohibited area (Doc. # 31-8 at 13), Barnes was *using* his cell phone in a prohibited area. (Doc. # 31-1 at 30). This means that Blackburn's violation of the Policy was not as blatant or intentional as was Barnes's. As in *Jenkins*, the proffered comparator's violation was not as serious as the plaintiff's violation. There is also "some good reason," as the Eleventh Circuit terms it, to distinguish between Blackburn's conduct and Barnes's conduct. An employee who intentionally violates a workplace policy exhibits a greater disrespect for that policy (and thus could be more likely to violate it in the future) than an employee who unintentionally does so.

A second difference is that Blackburn "immediately took her watch to her locker," which was an approved area (Doc. # 31-8 at 13), while Barnes did not take his cell phone to an approved area (instead taking it to the tape room, which was still within the prohibited area). (Docs. # 31-1 at 31; 31-17 at 14). Blackburn immediately cured her violation, while Barnes did not. Although Barnes did not have a locker, he never requested one before the day of his violation, and the Policy permitted cell phones in areas other than a locker (including several breakrooms, approved office areas, approved conference rooms, and an employee's vehicle). (*See* Docs. # 31-1 at 21; 31-7 at 9). As in *Jenkins*, the proffered comparator remedied her violation of the policy while the plaintiff did not. There is also "some good reason" to distinguish between Blackburn's conduct and Barnes's conduct. An employee who immediately remedies her violation reduces the danger involved in that violation and exhibits more respect for the policy than an employee who does not.

There is no dispute that Blackburn satisfies the other three guideposts from *Lewis*, as she was subject to the same policy as Barnes (*see* Doc. # 31-7 at 9), was under the same supervisor

(Pollard) (*see* Doc. # 31-8 at 13), and similar to Barnes, began working at 3M in 2020. (*See* Docs. # 30 ¶¶ 1, 7, 33; 31-5 at 11). However, Eleventh Circuit caselaw emphasizes "substantive likenesses," *Lewis I*, 918 F.3d at 1228, and fellow employees may be invalid comparators solely because they did not engage in the same misconduct as the plaintiff. *See Jenkins*, 26 F.4th at 1250.

Neither Title VII nor § 1981 require courts to be "super-personnel department[s]" or allow them to "second-guess the wisdom of an employer's business decisions." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," there is no place for courts to get involved unless there is unlawful discrimination. *Id*. Because Barnes has not identified a valid comparator, he has not presented sufficient evidence to establish a prima facie case of race or sex discrimination and this court will not play the part of a "super-personnel department."

### B.    There is Insufficient Evidence of Pretext.

Even if Barnes had established a prima facie case, 3M rebutted any inference that would be raised by such a prima facie case by articulating a legitimate, non-discriminatory reason for Barnes's termination: "violation of the Electronic Device Policy by having his cell phone in a classified area, and his failure to put his phone in an area identified as appropriate per the policy after being confronted by his supervisor." (Doc. # 30 at 24). It is undisputed that Barnes violated the Policy by using his cell phone in a space that the Policy prohibited. (Docs. # 31-1 at 31; 31-7 at 15, 9). And it is undisputed that the Policy specified that employees would be disciplined, up to termination, for violating its terms. (Doc. # 31-7 at 9). A non-discriminatory reason is legitimate if it "is one that might motivate a reasonable employer." *Chapman*, 229 F.3d at 1030 (citing *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000)). A reasonable employer

might be motivated to terminate an employee for violating a policy intended to reduce workplace hazards – particularly where that policy outlines termination as a possible disciplinary action. 3M has therefore met its burden of proffering a legitimate, nondiscriminatory reason for terminating Barnes's employment.

If the employer satisfies its burden by articulating a legitimate, non-discriminatory reason for terminating a plaintiff's employment, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the reason given by the employer is merely pretext for illegal discrimination. *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "To survive summary judgment, a plaintiff must present sufficient evidence for a reasonable jury to conclude 'not just that the employer's proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason.'" *Phillips*, 87 F.4th at 1323 (quoting *Alvarez*, 610 F.3d at 1267). "To establish pretext, an employee must 'cast sufficient doubt on the [employer's] proffered nondiscriminatory reasons'" for the adverse employment action "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Phillips*, 87 F.4th at 1323-24 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). An employee cannot survive summary judgment by "substitut[ing] his business judgment for that of the employer . . . [or] simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

Barnes argues that 3M's proffered reason for his termination is pretextual, and points to (1) what he says is conflicting evidence surrounding his termination; (2) Blackburn's, Prowell's and Meeks's violations of the Policy although they were not terminated; and (3) alleged deficiencies in 3M's training as to the Policy. After careful review, however, the court concludes

that this evidence does not undermine the credibility of 3M's proffered reason for firing Barnes and does not create a material issue of fact for a jury to decide.

First, Barnes highlights what he characterizes as disputed details in the record. For example, according to Pollard, she offered to get Barnes a locker or store his cell phone in the supervisors' office, but he refused both. (Doc. # 31-17 at 13). According to Barnes, Pollard told him she would go get him a locker but did not tell him what to do with the cell phone in the meantime. (Doc. # 31-1 at 25, 31). This is a non-material dispute. Even if Pollard did not tell Barnes what to do with his cell phone, he still violated the Policy in the first place. Additionally, the Policy outlines that phones are permitted in breakrooms, approved office areas, approved conference rooms, and personal vehicles. (Doc. # 31-7 at 9). Therefore, under either set of facts, Barnes had multiple options by which to remedy his violation but did not take advantage of them. Thus, Barnes has not rebutted 3M's reason for terminating him.

Barnes also highlights that Pollard's written statement, which the 3M Management Review Committee reviewed before deciding to terminate him, was inconsistent with Pollard's later deposition testimony. (Doc. # 35 at 30-32). Specifically, Pollard's written statement after the incident indicated that Barnes put his cell phone in his pocket and kept it there (Doc. # 31-17 at 55), while her (and Barnes's) deposition testimony stated that Barnes had told Pollard and Johnson that he had put his phone in the tape room. (Docs. # 31-1 at 31; 31-17 at 14-15). This is also a non-material dispute. Whether the 3M Management Review Committee believed that Barnes kept his phone in his pocket or put it in the off-limits tape room, Barnes violated the Policy and did not cure his violation.

This evidence is also distinguishable from what the Eleventh Circuit found to be legitimate pretext evidence in *Phillips*. The *Phillips* employer's legitimate reason for terminating the plaintiff

in that case was repeated insubordination. *See* 87 F.4th at 1323. But the plaintiff presented evidence that she was not insubordinate. *Id*. Therefore, the Eleventh Circuit reasoned, a jury could find the employer's proffered reason to be pretextual. *Id*. In contrast, here, it is *undisputed* that Barnes violated the Policy.

Because these disputed details in the record are immaterial to the reason for Barnes's termination, they also do not suggest that the real reason for Barnes's termination was race or sex discrimination. Barnes's argument about inconsistent details in the Rule 56 record simply does not cut ice.

Second, Barnes challenges 3M's explanation for his termination as pretextual because Blackburn, Prowell, and Meeks violated the Policy without being terminated.[2] But (as discussed in the prima facie analysis) Barnes's misconduct was different than Blackburn's. Barnes *used* his device in a prohibited area, while Blackburn merely *wore* her Apple watch. And, after being confronted by Pollard, Blackburn immediately remedied her violation, but Barnes did not. (Docs. # 31-1 at 31; 31-7 at 15; 31-8 at 13). Thus, the different treatment of Blackburn does not suggest 3M's explanation for Barnes's termination was pretextual.

Prowell's conduct also differed from Barnes's. When Prowell was caught using her phone, she immediately remedied her violation by taking "the phone to the guard's desk," which is a permitted area under the Policy. (Doc. # 31-7 at 14). This does not demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in 3M's decision to terminate Barnes because "a reasonable factfinder" could still find 3M's reason for termination worthy of credence. *See Phillips*, 87 F.4th at 1323-24 (quoting *Combs*, 106 F.3d at 1538). An employee who immediately remedies her violation demonstrates respect for the policy and removes the danger

---

[2] Evidence of pretext can, "of course," include the same evidence that would support a prima facie case – such as a comparator. *Lewis*, 918 F.3d at 1223 n.9.

presented by that violation, while an employee who continues to violate a policy does not. Further, 3M initially terminated Prowell, and that decision was only rescinded after the union grieved her discharge. Here, there was a grievance related to Barnes's termination as well, but 3M did not rescind its decision. This does not suggest any pretext for discrimination because (1) there were different circumstances involved in Prowell's violation as compared to Barnes's and (2) Prowell was a longer tenured employee.

Finally, Meeks's conduct differed from Barnes's conduct. Barnes argues that although Meeks (like Barnes) is a white man, the fact that Meeks's termination was changed to a suspension and Last Chance Agreement indicates that 3M used Meeks as a "mask to cover up a discriminatory decision." (Doc. # 35 at 25). Specifically, Barnes argues that a discriminatory pattern was emerging when 3M merely suspended Prowell and Blackburn (both Black females) but went further and terminated Barnes (a white male). So (under Barnes's logic), Meeks's violation of the Policy, which occurred one month after Barnes's, was a chance for 3M to show that it was not discriminating against white men. (*See* Doc. # 35 at 25-28). But, this argument ignores that there were legitimate reasons for 3M to treat Meeks more favorably than Barnes. Meeks said he forgot to remove his cell phone from his pocket, and he immediately remedied the violation by leaving his phone in his supervisor's office. (Doc. # 31-11 at 2). While Meeks unintentionally *possessed* his cell phone and immediately remedied the violation, Barnes was intentionally *using* his cell phone – and, when confronted, Barnes did not remedy his violation. Again, 3M initially terminated Meeks and only changed its decision as part of the union grievance process. This distinction shows that the union's successful grievance of Meeks's termination does not suggest pretext.

Because the treatment of Blackburn, Prowell, and Meeks is materially different from the treatment of Barnes, this evidence also does not establish that the real reason for Barnes's

termination was race or sex discrimination. Barnes's argument about inconsistent details in the Rule 56 record does not demonstrate pretext.

Barnes makes additional arguments related to 3M's treatment of Meeks. He contends that Meeks's termination was an attempt to mask 3M's desire to promote diversity and inclusion over non-discrimination. (Doc. # 35 at 28). In support of this point, Barnes highlights that Human Resources personnel sought a legal opinion before terminating Barnes (Doc. # 31-5 at 29), 3M had a DEI program (Doc. # 31-7 at 2-8), and Human Resources personnel mentioned workforce diversity in an end-of-year summary. (Doc. # 31-15 at 17). Barnes highlights no caselaw indicating that seeking a legal opinion before terminating an employee, having a DEI program, or *mentioning* workforce diversity in an end-of-year summary is in any way unlawful or relevant to the question of pretext. Indeed, courts are "extremely wary of citing lawful affirmative action plans as evidence" of intentional discrimination. *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001). Because Barnes does not highlight any evidence besides the mere presence of affirmative action initiatives or a request for a legal opinion, this evidence is not enough to establish pretext.

Third, Barnes argues that storing his cell phone in the tape room should have remedied his Policy violation because there was insufficient training on the Policy. Barnes testified that he was never told before September 16, 2019, that he could not use his cell phone in the tape room. (Doc. # 31-1 at 25). Barnes presents evidence of other employees (including a former supervisor) using their cell phones in the tape room (*id.*) and evidence that 3M's training on the Policy requirements was insufficient. (*Id.* at 23-24). Barnes argues that this evidence could allow a jury to find that he believed putting his cell phone in the tape room remedied the Policy violation. (Doc. # 35 at 33-34). But, Barnes misunderstands the legal standard. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs," about the employee's conduct. *Alvarez*, 610 F.3d

at 1266. Evidence that Barnes did not know cell phones were prohibited in the tape room is irrelevant because the Policy states that they were prohibited in such an area. To demonstrate pretext, Barnes must present evidence that *3M* did not believe Barnes violated the Policy. *Id.* The Rule 56 record is devoid of such evidence.

Barnes has thus not shown "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [3M's] proffered legitimate reasons" for firing Barnes such "that a reasonable factfinder could find them unworthy of credence." *Phillips*, 87 F.4th at 1323-24. However, even if there were sufficient evidence of pretext, Barnes has also failed to present sufficient evidence that the true reason for his termination was race or sex discrimination.

### C.    Barnes Has Not Demonstrated a Convincing Mosaic Under a Single-Motive Theory.

Barnes also states that "[his] claims [should] advance pursuant to the convincing mosaic framework," but does not explain specifically how this framework applies to the facts of his case. Nevertheless, for completeness, the court has carefully reviewed Barnes's claim under this framework and again concludes that Barnes's single-motive theory of race or sex discrimination fails.

"[The Eleventh Circuit] has used the phrase 'convincing mosaic' simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). The Eleventh Circuit has described this as a "story, supported by evidence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th

Cir. 2011). "That evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)). And because this inquiry is at the summary judgment stage, "Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012).

First, Barnes points to an "ambiguous statement" by "3M's Operations Manager Daphne Hendrix," who "observed Blackburn wearing the watch and asked Blackburn's supervisor 'to make sure that she didn't have her Smart watch on.'" (Doc. # 35 at 20). Barnes argues that "[a] reasonable person can infer that the Defendant's Female Operations Manager did not want the minority Female, an underrepresented member of Defendant's workforce, to suffer adverse consequences." (*Id.*). Barnes further argues "Hendrix's testimony allows a jury to conclude that Blackburn was given an opportunity to remedy a situation prior to receiving discipline whereas Plaintiff was offered no such opportunity." (*Id.*). But, Hendrix's statement is neither "ambiguous" nor suggestive of discriminatory intent. Hendrix's comment did not reference race or sex, and it is not even clear that the comment evinced a favorable disposition toward Blackburn. The statement only shows that Hendrix prompted Pollard to see if Blackburn had her smart watch on. Barnes also does not explain how Hendrix's instruction was linked to Blackburn's suspension, nor does he explain how any supposed "opportunity to remedy" was given to Blackburn and withheld from Barnes. Both had the opportunity to put their devices in a place that was not prohibited by the Policy – in Barnes's case, a breakroom, approved office, approved conference room, or his vehicle, and in Blackburn's case, a locker.

Second, Barnes turns to evidence of "systematically better treatment of similarly situated employees." He asserts that Blackburn engaged in similar misconduct but, unlike Barnes, was provided a locker to be able to remedy her Policy violation and had the benefit of Fact Finding with the assistance of a union representative before disciplinary action was taken. Barnes also highlights a discrepancy between various pieces of evidence which, he contends, creates a question of fact about whether he was provided an opportunity to remedy his violation. For example, while Barnes testified that Pollard offered to provide him with a locker, Pollard's written statement was that she offered Barnes the opportunity to place his cell phone in her office. (Doc. # 35 at 21). Pollard's deposition testimony was that she offered Barnes both her office and a locker. (*Id.*). However, Barnes never connects any purported discrepancy with how a jury could infer intentional discrimination. It is undisputed that Barnes could have asked – but he did not ask – for a locker at any time before the day of his violation. And even without a locker, Barnes has never explained why he could not have put his cell phone into a permissible location, such as a breakroom, approved office, approved conference room, or his vehicle.

Regarding the Fact Finding, Barnes argues that "[s]uch Fact Finding would have found consistent use of the Tape Room as a storage for personal belongings including Personal Electronic Devices." (*Id.* at 23). Barnes never clarifies how this information would have changed the discipline that he ultimately received. And, he also ignores Pollard's testimony that the reason she did not conduct a Fact Finding for Barnes was because "he blatantly refused." (Doc. # 31-17 at 17). In other words, Barnes did not cure his violation of the Policy even after being confronted. For reasons already discussed, this was a material difference between Blackburn's and Barnes's violation and is a logical and non-discriminatory reason why Pollard did not conduct a Fact Finding for Barnes.

21

Even considered together, this evidence does not present a convincing mosaic to allow Barnes to survive summary judgment. This case is therefore unlike *Jenkins*, in which the Eleventh Circuit ruled that the plaintiff could survive summary judgment because there were many pieces of evidence suggesting discriminatory intent, and much of the evidence centered on credibility determinations. *Jenkins*, 26 F.4th at 1251. This evidence included: (1) that plaintiff and a coworker violated the same policy but only the coworker remained employed (like this case); (2) that eighteen white crane operators had left the department since the supervisor had taken over; (3) that the supervisor had mistreated three white crane operators; (4) a bad relationship between the supervisor and HR; (5) "racially-biased comments about white crane operators"; (6) plaintiff's actions; and (7) the supervisor's shifting reasons for terminating the plaintiff. *Id.* at 1250-51.

The evidence that Barnes lists is different in kind and quantity from the evidence in *Jenkins*. For example, Barnes has pointed to no evidence of any other white male employees being terminated or otherwise leaving his department. Indeed, he highlighted an example of a white male employee (Meeks) who was *not* ultimately terminated. Barnes has also not cited any evidence of Pollard mistreating other white men or of a bad relationship between Pollard and 3M's Human Resources. Barnes has not pointed to evidence of any racially or sexually biased comments by Pollard or anyone else at 3M. Even Barnes's argument about DEI highlights the following facially neutral evidence: a Human Resources manager's deposition testimony – which was directly prompted by a question from his lawyer about white male applicants – that "[w]e have a lot of white males that do seek employment at 3M and the majority of the workforce is reflected in that." (Doc. # 35 at 29). Finally, Barnes has not highlighted any evidence that 3M gave shifting reasons for his discharge. 3M's reason for terminating Barnes was that he violated the Policy. While Pollard's written statement differed from her deposition testimony by stating that Barnes had his

phone in his pocket, under either scenario 3M would have still concluded that he violated the Policy and was subject to termination.

This case is also unlike *Lewis II*,[3] in which the Eleventh Circuit held that comparator evidence was relevant to a convincing mosaic where there were:

> (1) three officers – two white men and one African-American woman – each were required to possess a physical ability said to be essential to the performance of his or her job, (2) each either failed a test as to whether the officer possessed the respective physical ability or failed to provide a certificate evidencing the possession of the relevant physical ability, and (3) both of these white men then were treated far more favorably than this African-American woman in that both were given extended periods of time to attempt to demonstrate the physical ability but the African-American woman was fired without warning.

934 F.3d 1169, 1187-88 (11th Cir. 2019) (*Lewis II*). The first listed item certainly resembles this case, as both Blackburn and Barnes were required to obey the Policy. The second listed item presents a weaker comparison because although Blackburn and Barnes both violated the Policy, they did so in different ways. Blackburn's violation was less egregious than Barnes's and Blackburn immediately remedied it – but, Barnes did not. The third listed item presents the weakest comparison. In *Lewis II* the white officers "were treated far more favorably" in that they were given an extended period in which to demonstrate compliance with a requirement. There is no such evidence of Blackburn being treated "far more favorably" here. Both Blackburn and Barnes were cited *and* disciplined for violating the Policy. To be sure, Blackburn was only suspended, which is significantly more lenient than a termination, but there was a non-discriminatory reason for this because Blackburn's violation was less serious and immediately remedied.

Even stepping away from strict comparisons to the facts in *Jenkins* or *Lewis II*, what Barnes has presented here does not come close to presenting a picture that could allow a jury to infer

---

[3] This case was on remand from *Lewis I* (referenced earlier in this Memorandum Opinion).

intentional discrimination. His proffered evidence either does not logically connect to his termination at all or cannot rebut the clear and consistent reason 3M has given for Barnes's termination – his violation of the Policy. *See Holley v. Ga. Dep't of Corrections*, 845 F. App'x 886, 891 (11th Cir. 2021) (holding that a plaintiff did not present a convincing mosaic because he did not "cast sufficient doubt on the [defendant's] proffered nondiscriminatory reasons") (citing *Lewis II*, 934 F.3d at 1185-86).[4] For these reasons, this evidence would not allow a reasonable factfinder to infer that intentional discrimination was the only reason for Barnes's termination.

### D.    Barnes Has Not Established a Discrimination Claim Under a Mixed-Motive Theory.

Barnes merely references that "Plaintiff asserted both single-motive and mixed-motive theories" (Doc. # 35 at 15) (footnotes omitted) but does not elaborate in his Complaint or summary judgment briefing precisely what his mixed-motive theory is. (*See* Docs. # 1; 35). Although Barnes uses a footnote to offer a quote explaining the legal standard for a mixed-motive theory, he does not apply this theory to the Rule 56 record or present any cognizable argument based on a mixed-motive theory. This is not enough to raise a mixed-motive theory.

"A mixed-motive theory must be properly pleaded and argued at each stage of the litigation." *Billings v. Pettsay*, 2021 WL 6050684, at *18 (N.D. Ala. Dec. 21, 2021). "[A] plaintiff

---

[4] To be clear, the court recognizes that in this case a majority group member claims discrimination and points to a minority group member as a comparator. The Supreme Court recently heard oral argument in a case in which a majority group employee sued her employer claiming discrimination. *Ames v. Ohio Dep't of Youth Servs.*, 23-1039 (argued Feb. 26, 2025). The Petition for a Writ of Certiorari in *Ames* explained that "five courts of appeals require majority group plaintiffs, in addition to the other elements of Title VII, to also prove 'background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Petition for Writ of Certiorari, *Ames* at *3 (No. 23-1039).

Notwithstanding this circuit split and the pending Supreme Court decision in *Ames*, the issue of majority versus minority group membership is not a deciding factor here and the court has neither treated Barnes's claims as an unusual situation nor required any "background circumstances." If the facts of this case were different – that is, Barnes was Black and Blackburn was white (or if Barnes was a woman and Blackburn was a man, and so on) – there would still not be any issue of fact for a jury to decide. The Rule 56 record does not suggest any race or sex discrimination or pretext for such discrimination.

cannot make only a 'passing reference to a mixed-motive theory' to sufficiently raise the issue." *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130 (11th Cir. 2019) (citing *Keaton v. Cobb Cnty.*, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)). Because Barnes did not brief this issue, and in any event the Rule 56 evidence lends no support to this theory, his claims cannot survive summary judgment under a mixed-motive theory.

## IV.    Conclusion

For the reasons discussed above, 3M's Motion for Summary Judgment (Doc. # 29) is due to be granted. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this March 12, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE